UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| J.P. MORGAN SECURITIES LLC, | ) | |
| | ) | CIVIL ACTION NO. 26-571 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS L. STALEY, | ) | |
| | ) | |
| Defendant. | ) | |

COMPLAINT
(INJUNCTIVE RELIEF SOUGHT IN AID OF ARBITRATION)

Plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff"), files this Complaint and Application for Temporary Restraining Order and Injunctive Relief against Defendant Thomas L. Staley ("Staley" or "Defendant"):

**Preliminary Statement**

1.      This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between JPMorgan and Defendant that concurrently is being filed with FINRA Dispute Resolution.[1]

2.      This dispute arises out of Staley's voluntary resignation of employment from JPMorgan on February 6, 2026 and the immediate commencement of his affiliation with Maia Wealth, LLC ("Maia"), an independent Registered Investment Advisor and a competitor of JPMorgan.  At the time of his resignation from JPMorgan, Staley was a Private Client Advisor,

---

[1]      The Financial Industry Regulatory Authority ("FINRA") was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange.  JPMorgan has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel of duly-appointed arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes.  A true and correct copy of Rule 13804 is annexed as Exhibit A to the Declaration of Leonard Weintraub.

working in a bank branch office of JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), an affiliate of JPMorgan, in Westfield, Indiana.

3. Staley entered into an agreement with JPMorgan that contains post-employment restrictive covenants prohibiting him from soliciting JPMorgan's clients for a period of one year after the termination of his employment, and requiring him to maintain the confidentiality of JPMorgan's confidential and proprietary business and client information.

4. JPMorgan has learned, however, that since resigning from JPMorgan and joining Maia, Staley is soliciting JPMorgan clients to move their accounts from JPMorgan to him at Maia. JPMorgan has learned that Staley is contacting JPMorgan clients, including calling clients on their personal cell phone numbers, seeking to induce such clients to transfer their business relationships from JPMorgan to him at Maia. The clients have informed JPMorgan that Staley's communications have been more than simply announcing his change of employment; he is actively requesting meetings with the clients or seeking to discuss Maia and moving the client relationships to him at Maia.

5. Numerous JPMorgan clients formerly serviced by Staley have informed JPMorgan that since Staley resigned from JPMorgan, they received calls from him, sometimes on multiple occasions, during which Staley solicited their business, asked the client to meet with him at Maia, or otherwise attempted to get the client to transfer their accounts to Maia.

6. One client (a husband and wife) informed JPMorgan that Staley called them twice, and told them that he could not ask them to come with him, but they could tell him they wanted to meet with him. The client declined such meeting. However, Staley told the client that he would call a third time in a few weeks to see if they wanted to connect.

2

7. Another client informed JPMorgan that Staley called him and offered him a better return if he moved his assets to Staley at his new firm.

8. Another client informed JPMorgan that Staley called her and told her that he could not solicit her business, but told the client that he could offer her lower fees if she moved her assets to Staley at his new firm, and asked the client to meet with him.

9. Another client informed JPMorgan that Staley called her and told her of the benefits of working with him at his new firm, including lower fees and access to more personalized service because he had fewer households to handle than he did at JPMorgan.

10. Staley's solicitations calls have continued into March. Another client informed JPMorgan that Staley had called him multiple times on his cell phone, and most recently called on March 9, 2026 asking for a meeting, and told the client he could offer the client a lower fee than he was paying at JPMorgan.

11. Another client informed JPMorgan that Staley called him on March 17, 2026 and told the client that his expenses would be significantly lower if he moved his accounts to him. Of great concern, the client also stated that Staley told him that his fees were significantly higher at JPMorgan than they actually were, presumably to scare the client into transferring his assets.

12. Another client informed JPMorgan that Staley called her on March 17, 2026 and told her that JPMorgan is somewhat limited as to the potential investments it has access to, and that the client could get a higher return if she moved her assets to Staley at Maia.

13. In addition, on information and belief, Staley took with him to Maia JPMorgan's confidential client information, including client contact information, such as cell phone numbers, which, on information and belief, are generally not publicly available, without

3

which he would have been unable to immediately commence calling and soliciting JPMorgan clients shortly after resigning from JPMorgan.

14.    As discussed in more detail below, Staley engaged in highly suspicious computer access on JPMorgan's system in the weeks and days before his resignation. Specifically, Staley accessed an unusually high number of client profiles on JPMorgan's computer system in the twenty-four hours before he resigned. The client profiles accessed by Staley contain highly confidential client information, including client names, addresses, email addresses, phone numbers, and other information needed to contact and solicit JPMorgan clients upon his departure.

15.    Unfortunately, it appears that Staley's solicitation efforts have proved successful, as approximately 22 JPMorgan households, with assets totaling approximately $5.8 million, already have transferred their accounts to Staley at Maia.

16.    At the time he left JPMorgan, Staley serviced approximately 272 JPMorgan households, with approximately $123 million in total assets under supervision, the vast majority of which were either pre-existing JPMorgan clients at the time they were assigned to him, or were developed by him at JPMorgan with JPMorgan's assistance. Staley now seeks to improperly induce such JPMorgan clients to follow him to Maia.

17.    Defendant's conduct constitutes a breach of his employment agreement (which contains non-solicitation and confidentiality provisions), and a violation of his common-law obligations to JPMorgan.

18.    To prevent continued irreparable harm arising from Defendant's course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendant from soliciting JPMorgan's clients, and barring him from further using JPMorgan's confidential and proprietary business and client

4

information, pending resolution of JPMorgan's claims against him in a related arbitration that JPMorgan is in the process of commencing.

## Jurisdiction and Venue

19.    The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that, as alleged below, plaintiff JPMorgan, on the one hand, and Defendant, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claims occurred in Westfield, Indiana.

## The Parties

21.    Plaintiff JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York City, New York.  The sole member of JPMorgan is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware corporation with its principal place of business in New York, New York.  JPMorgan is a member firm of FINRA.

22.    JPMorgan provides traditional banking, investment, and trust and estate services in Indiana through its Chase Wealth Management branch offices.  Unlike traditional brokerage firms (where clients are serviced almost exclusively by one registered representative), JPMorgan's Chase Wealth Management adopts a team approach.

23.    Defendant is an individual who at all times relevant herein was employed and/or conducted business in a Westfield, Indiana office of JPMorgan and was and is a citizen of Indiana, living in Carmel, Indiana.  Defendant also is a registered representative currently associated with Maia in its Indianapolis, Indiana office.  Defendant maintains securities licenses through FINRA.

5

24.     In connection with his status as a registered representative of JPMorgan, Defendant executed a Form U-4 Uniform Applications for Securities Industry Registration or Transfer.  By executing the Form U-4, Defendant agreed to submit to arbitration before FINRA disputes, claims and controversies arising between himself and JPMorgan.  Under FINRA rules, if a party seeks temporary injunctive relief in connection with an arbitrable dispute, it must seek such relief from a court, not FINRA.

### Factual Allegations

25.     In February 2015, Defendant starting working for JPMorgan, and within a few weeks became a Private Client Advisor, a position he remained in until his resignation.  In connection with the commencement of his employment, Staley entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement with JPMorgan, dated December 30, 2014 (the "Non-Solicitation Agreement"), which contains provisions prohibiting him from soliciting the firm's clients for a one-year period after the end of his employment and requiring him to maintain the confidentiality of the firm's confidential and proprietary business and client information.

26.     As a Private Client Advisor, JPMorgan Chase referred its bank clients to Staley in order for him to build JPMorgan's relationship with such clients.  Staley sat at his desk at JPMorgan Chase bank branches – in Carmel, Indiana (from February 2015 through April 2020) and in Westfield, Indiana (from May 2020 through February 6, 2026) – and was introduced to hundreds of existing bank clients (with or without investment accounts) to offer and provide access to investment opportunities through Chase Wealth Management.  As a Private Client Advisor, Staley was not expected to engage in cold calling or attempt to build a client base independent of referrals from JPMorgan.  Staley remained a Private Client Advisor until his resignation.

27.    JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its clients over many years.  It is with great difficulty, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients.  JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information.  It typically takes many years of dealing with clients for JPMorgan to become their primary investing firm.  JPMorgan clients typically remain with and continue to be serviced by the firm, regardless of whether the Private Client Advisor or other team members resign or leave JPMorgan.  But for Staley's employment with JPMorgan, he would not have had any contact with the vast majority of the clients the firm assigned or introduced to him and whom he is now soliciting.

28.    As part of his official duties at JPMorgan, Staley had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's investments, banking, lending, approximate outside assets, and estate planning needs.  As explained in further detail below, such information – which is not publicly available, and cannot be easily duplicated – is proprietary and valuable, and would be especially useful to a competitor such as Maia.

### Defendant's Obligations to JPMorgan

29.    As noted above, in connection with the commencement of his employment with JPMorgan, Defendant entered into the Non-Solicitation Agreement, that, among other things, contains provisions prohibiting him from soliciting JPMorgan clients for a period of one year after his JPMorgan employment ends and from using or retaining JPMorgan confidential information.

30.    Section 7(a) of the Non-Solicitation Agreement, entitled "Confidential Information," provides, in relevant part, that:

*You understand that, by entering into this Agreement, by virtue of your position with JPMC and by the nature of JPMC's business, you have had access to, currently have access to, will have access to and will consistently and routinely be given trade secrets and confidential information related to JPMC's business. Confidential information concerning JPMC's business includes information about JPMC, as well as described further in the Code of Conduct and subparagraphs (b) and (c) below (the "Confidential Information"). You also understand that you will be provided with specialized training and mentoring that is unique and proprietary, which draws upon, relies upon and is part of the Confidential Information described herein.*

31.    Section 7(b) of the Non-Solicitation Agreement provides, in relevant part, that, in addition to any description in the Code of Conduct, Confidential Information includes, but is not limited to:

*i. names, addresses and telephone numbers of customers and prospective customers;*

*ii. account information, financial standing, investment holdings and other personal financial data compiled by and/or provided to or by JPMC;*

*iii. specific customer financial needs and requirements with respect to investments, financial position and standing; leads, referrals and references to customers and/or prospects, financial portfolio, financial account information, investment preferences and similar information, whether developed, provided, compiled, used or acquired by JPMC and/or yourself in connection with your employment at JPMC;*

\*    \*    \*

*vi. all records and documents concerning the business and affairs of JPMC (including copies and originals and any graphic formats or electronic media);*

\*    \*    \*

*viii. information concerning established business relationships;*

*ix. "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section.*

32.     In Section 7(c) of the Non-Solicitation Agreement, Defendant again expressly acknowledges that JPMorgan's customer account information contains confidential financial information, names, addresses, customers' net worth, investment objectives and similar information which is confidential, not readily known by competitors, and must be safeguarded.

33.     In Sections 7(d) and 7(e) of the Non-Solicitation Agreement, Defendant agreed to maintain the confidentiality of JPMorgan's Confidential Information, not to disclose such Confidential Information to or use for the benefit of any third party, and to return all JPMorgan Confidential Information upon the termination of his employment.

34.     In Section 8 of the Non-Solicitation Agreement, Defendant agreed not to solicit JPMorgan's clients for a period of twelve months after the termination of his employment:

   a. *You understand and acknowledge that JPMC considers its client and customer relationships important and valuable assets. Accordingly, in consideration of and as a condition of your employment, continued employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein,* ***you understand and agree for a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave, initiate contact with or divert from doing business with JPMC, any then current customers, clients, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with JPMC, or otherwise interfere with the relationship between JPMC and such customers, clients, or other persons or entities.***

   b. *You understand and agree that JPMC has developed and uses a unique business model for the offering of investment and bank products and services, including without limitation the Chase Wealth Management and the Chase Private Client platforms. Specifically, you acknowledge and understand that the vast majority of customers with whom you will be working with at JPMC have pre-existing investment relationships with JPMS and/or pre-existing and separate banking relationships with JPMorgan Chase Bank, N.A. Additionally, you will be working with other JPMC employees to develop and strengthen these relationships*

*on behalf of JPMC. The customer relationships developed at JPMC and given to you by JPMC flow directly from the goodwill, reputation, name recognition, Confidential Information, specialized training, mentoring and expenditures made by JPMC. This platform and relationship model developed by JPMC is special and unique to JPMC, providing you and JPMC with a unique opportunity to service and interact with clients and customers in ways not known or available to competitors. You acknowledge that by utilizing the platforms, you will be given access to confidential information and/or trade secrets, which are not readily available through any public sources and the protection of which represent a legitimate business interest of JPMC.*

c. *This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you are able to substantiate through documents or other suitable evidence that the relationship preceded commencement of your employment with the JPMC, and any such customers are listed on Attachment A signed by your manager.*

35. Although Staley had prior industry experience before he joined JPMorgan, on information and belief, he brought few, if any, clients with him to JPMorgan. In fact, in the "Attachment A" to his Non-Solicitation Agreement, Staley was permitted to identify all client relationships that he had established prior to commencing employment with JPMorgan, and those pre-existing relationships would be carved out from the non-solicitation restriction in the agreement. The "Attachment A" to the Non-Solicitation Agreement is blank (meaning Staley identified no pre-existing client relationships). Thus, on information and belief, Staley brought few, if any, clients with him to JPMorgan when he joined JPMorgan.

36. In Section 10(a) of the Non-Solicitation Agreement, Defendant agreed that the above-referenced provisions are reasonable, and that he voluntarily entered into the agreement after having had an opportunity to review it with his counsel:

i. *You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under Sections 7, 8, and 9 of this Agreement, and have had the opportunity to retain legal counsel at your own expense to*

*review this Agreement. You acknowledge that these restrictions are reasonable in time and geographic scope, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.*

ii. *You acknowledge that the terms and conditions of Sections 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.*

iii. *You acknowledge that you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving compensation associated with non-deposit investment products, and that you are signing it knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions. You further acknowledge the reasonableness and enforceability of the terms of this Agreement, and you will not challenge the enforceability or terms of this Agreement.*

37.    In addition, in Section 10(b) of the Non-Solicitation Agreement, Defendant acknowledged that any breach of the provisions set forth above will cause irreparable harm to JPMorgan entitling it to seek immediate injunctive relief and to recover its attorneys' fees in connection with instituting any legal proceeding and/or arbitration to enforce the Non-Solicitation Agreement.

38.    In consideration for entering into and continuing his employment relationship with JPMorgan and executing his agreement with JPMorgan, Defendant was provided with significant benefits, including substantial compensation, office and support facilities, securities registration, research, and health insurance.

**JPMorgan's Confidential Information**

39.    During the course of his employment with JPMorgan, Staley had access to highly confidential JPMorgan client files in addition to other financial information that is confidential and proprietary to JPMorgan.  JPMorgan's client files contain confidential financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data.  Staley had no interaction with the vast majority of the clients he was assigned at JPMorgan (and no knowledge of any of their confidential information) until he started working at JPMorgan.  As indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

40.    A critical factor to JPMorgan's continued success is its relations with its clients.  JPMorgan has built the loyalty of its client base through many years of effort and has invested substantially in building JPMorgan's goodwill.  JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Chase Wealth Management employees, including Staley, for them to use to obtain and build relationships with its clients.

41.    JPMorgan's records maintained concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients.  JPMorgan has invested substantial corporate resources to develop and maintain its client information.  The vast majority of the JPMorgan clients that Staley serviced were developed by JPMorgan at great expense and over a number of years.  JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients

include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

42.    JPMorgan also has expended significant resources to service its clients. These resources include millions of dollars a year JPMorgan spends for support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services.  JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

43.    JPMorgan employs reasonable efforts to maintain the confidentiality of its client records.  Specifically, access to the records is restricted to those employees whose jobs require them to refer to this information, duplication of the records is prohibited and there are constant reminders about the confidential nature of the information contained on the records. Employees such as Staley must maintain client information as strictly confidential.   These instructions are confirmed in the agreement referenced above.

### Defendant's Misconduct

44.    As noted above, Staley abruptly resigned from JPMorgan on February 6, 2026, immediately joined Maia, and began soliciting JPMorgan clients.

45.    JPMorgan has learned that since resigning from JPMorgan and joining Maia, Staley is soliciting JPMorgan clients to move their accounts from JPMorgan to him at Maia. JPMorgan has learned that Staley is contacting JPMorgan clients, including calling clients on their personal cell phone numbers, seeking to induce such clients to transfer their business relationships

from JPMorgan to him at Maia.   The clients have informed JPMorgan that Staley's communications have been more than simply announcing his change of employment; he is actively requesting meetings with the clients or seeking to discuss Maia and moving the client relationships to him at Maia.

46.    Staley's solicitation of JPMorgan clients is ongoing and continuing.

47.    In addition, on information and belief, without misappropriating JPMorgan's confidential client information, Staley would not have had clients' personal phone numbers, and would not have had the ability to call JPMorgan clients immediately after he resigned.

48.    Staley engaged in extensive highly suspicious computer access of JPMorgan's systems in the weeks prior to his resignation.  On Friday night, December 19, 2025, starting at 9:07 p.m. and continuing through early Saturday morning, December 20, 2025, 1:56 a.m., Staley accessed approximately 67 client profiles on JPMorgan's Advisor Central system after business hours.  That same Saturday evening, December 20, 2025, from 9:40 – 11:35 p.m., Staley accessed approximately 33 client profiles (including one prospect) on JPMorgan's Advisor Central system after business hours.  The following evening, Sunday, December 21, 2025, 10:44 p.m. and continuing through early Monday, December 22, 2025, 1:42 a.m., Staley accessed approximately 71 client profiles (including a handful of prospects) on JPMorgan's Advisor Central system after business hours.  Thus, in one long weekend, Staley accessed approximately 171 client profiles.  To put this number in perspective, during the entire months of October and November 2025, Staley only accessed a total of 259 and 266 client profiles, respectively.

49.    Additionally, in the 24 hours before he resigned, Staley accessed approximately 140 client profiles on JPMorgan's Advisor Central system.  Specifically, on February 5, 2026 – the day before he resigned – from 1:59 p.m – 5:20 p.m., Staley accessed approximately 92 client profiles (including numerous prospects) on JPMorgan's Advisor Central system.  On February 6, 2026 – less than an hour before he handed in his resignation letter – from 10:01 a.m. – 12:06 p.m., Staley accessed approximately 48 client profiles (including numerous prospects) on JPMorgan's Advisor Central system.

50.    There is no legitimate business reason why Staley would need to access so many client profiles, especially those he did in rapid succession in the weeks before he resigned. Moreover, given that Staley resigned on February 6, 2026 in the morning, there is no legitimate business reason why Staley should have been accessing *48 client profiles in rapid succession* in the hours before he resigned, and 92 the day before.

51.    The client profiles accessed by Staley shortly before his resignation contain highly confidential client information, including client names, addresses, e-mail addresses, phone numbers, dates of birth, account numbers, account types, account balances and specific investment holdings.  On information and belief, Staley took such client information with him from JPMorgan to his new firm (by taking photos of the computer screens with his cell phone, copying, by intentionally trying to memorize the information, or via some other means), and is using such information at Maia to aid in his solicitation of JPMorgan clients.

52.    Unless Defendant's misconduct is immediately restrained and enjoined, other competitors of JPMorgan will be encouraged to engage in the same kind of improper behavior with complete impunity, the result of which will inflict severe and permanent damages on JPMorgan.

53.    Defendant's misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, tortious interference, conversion, and unfair competition.  Unless Defendant's conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same improper conduct.  This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients and employees.

54.    By improperly soliciting JPMorgan's clients, Defendant has caused and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by monetary damages.  Defendant's wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

(a)  Loss of JPMorgan clients and loss of client confidence;

(b)  Injury to JPMorgan's reputation and goodwill in Indiana;

(c) Use and disclosure of JPMorgan's confidential and proprietary information, including client information;

(d)  Damage to office morale and stability, and the undermining of office protocols and procedures; and

(e)  Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

55.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 54 hereof.

56.    Defendant breached his contract and agreement with JPMorgan by soliciting JPMorgan's clients and by, on information and belief, taking and using JPMorgan's confidential documents and information.  By soliciting JPMorgan's clients and using and

disclosing JPMorgan's proprietary and confidential information, Defendant seeks to convert to his benefit JPMorgan's protectable interests.

57.    JPMorgan has performed all of its duties under the contract.

58.    JPMorgan has been injured and will continue to be injured by Defendant's breaches of his agreement with JPMorgan in an amount which cannot readily be ascertained or compensated by money damages.

59.    As a direct and proximate result of Defendant's breach of his contract, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**SECOND CAUSE OF ACTION**
**(Misappropriation of Trade Secrets – Violation of the Indiana**
**Uniform Trade Secrets Act, Ind. Code Ann. §§ 24-2-3 *et seq*.))**

60.    JPMorgan realleges and incorporates herein by reference, the allegations of paragraphs 1 through 59 hereof.

61.    JPMorgan's confidential and proprietary business and customer information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information. JPMorgan expended substantial financial and human resources to develop this information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace.  Further, JPMorgan has taken substantial efforts to maintain the secrecy of its confidential and proprietary business and customer information, including but not limited to restricting access to such information, designating such information as confidential, and requiring confidentiality agreements.   Accordingly, JPMorgan's confidential

and proprietary business and customer information constitutes trade secrets pursuant to the Indiana Uniform Trade Secrets Act.

62. Defendant misappropriated JPMorgan's trade secrets and confidential information and utilized the information to contact and solicit JPMorgan clients to transfer their assets and business to them at his new firm. Defendant has engaged in such activities without the express or implied consent of JPMorgan and, indeed, in violation of his agreements prohibiting such conduct. Defendant engaged in this conduct despite the fact that he knew or had reason to know that his knowledge of JPMorgan's trade secrets and confidential information was acquired under circumstances giving rise to a duty to maintain its secrecy and to limit its use.

63. As a direct and proximate result of Defendant's misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## THIRD CAUSE OF ACTION
### (Conversion)

64. JPMorgan realleges and incorporates herein by reference, the allegations of paragraphs 1 through 63 hereof.

65. At all times, JPMorgan was, and still is, entitled to the immediate and exclusive possession of its confidential and other proprietary information, and all physical embodiments thereof, as alleged above.

66. JPMorgan is informed and believes that Defendant took JPMorgan's confidential and proprietary information, including but not limited confidential client contact information, without authorization, and converted such information for the use of Defendant and those acting in concert with him.

67.     The continued detention of JPMorgan's personal property by Defendant constitutes conversion.

68.     As a direct and proximate result of Defendant's conversion, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**FOURTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty and Duty of Loyalty)**

69.     JPMorgan realleges and incorporates herein by reference, the allegations of paragraphs 1 through 68 hereof.

70.     As an employee of JPMorgan, Defendant owed JPMorgan a duty of loyalty and a fiduciary duty of trust and loyalty.

71.     Defendant's fiduciary duty and duty of loyalty required him at all times to, among other things, act in JPMorgan's best interests and maintain the confidentiality of JPMorgan's confidential and proprietary business and customer information.  Defendant's fiduciary duty and duty of loyalty required him at all times to refrain from, among other things, soliciting JPMorgan's clients to join him at a competing company, and from competing with JPMorgan or assisting a competing business during the course of his employment with JPMorgan.

72.     Defendant breached his fiduciary duty and duty of loyalty to JPMorgan by engaging in the conduct alleged above.  Defendant engaged in such wrongdoing upon his resignation from JPMorgan and after he joined JPMorgan's competitor, Maia.

73.      As a direct and proximate result of Defendant's breach of his fiduciary duty and duty of loyalty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**FIFTH CAUSE OF ACTION**
**(Intentional and/or Negligent Interference with Actual**
**and Prospective Economic Advantages)**

74.      JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 73 hereof.

75.      JPMorgan has developed and maintains advantageous actual and prospective business relationships with its clients that promise a continuing probability of future economic benefit to JPMorgan.

76.      JPMorgan is informed and believes, and on that basis alleges, that Defendant knew or reasonably should have known about JPMorgan's advantageous actual and prospective business relationships with its clients.

77.      JPMorgan is informed and believes, and on that basis alleges, that Defendant has intentionally and/or negligently improperly interfered with, and continues to interfere with, JPMorgan's relationships with its clients by, among other things, directly and/or indirectly attempting to induce JPMorgan clients to sever their relationships with JPMorgan and to induce them to do business with his new firm.

78.      There was no privilege or justification for Defendant's conduct.  Moreover, Defendant's actions also constitute wrongful conduct above and beyond the act of interference itself, including breach of contract, unfair competition, breach of his fiduciary duty, and breach of his duty of loyalty.

79.    Defendant's conduct was and continues to be improper, willful and malicious.

80.    As a direct and proximate result of Defendant's tortious interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SIXTH CAUSE OF ACTION
### (Unfair Competition)

81.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 79 hereof.

82.    Defendant's conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

83.    Defendant's intentional conduct, including his solicitation of JPMorgan clients upon his departure from JPMorgan and, on information and belief, his retention and use of confidential contact information relating to JPMorgan clients, is contrary to honest practice and interferes with JPMorgan's business relations.

84.    As a direct and proximate result of the Defendant's unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

WHEREFORE, JPMorgan respectfully requests that a judgment be entered in its favor against Defendant as follows:

A.    In support of all claims for relief, a temporary and preliminary injunction lasting until such time as a duly appointed panel of arbitrators at FINRA renders an award in the

underlying dispute, enjoining and restraining Defendant, directly or indirectly, and whether alone or in concert with others, including but not limited to the directors, officers, employees and/or agents of Maia, from:

> (a) soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan client serviced by Defendant at JPMorgan or whose names became known to Defendant by virtue of his employment with JPMorgan (or any of its affiliates or predecessors in interest), excluding only those clients he formally serviced as broker of record at a prior firm and immediate family members; and

> (b) using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's clients, and/or JPMorgan's employees.

B.    Ordering Defendant, and all those acting in concert with him, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized, electronically stored or handwritten) pertaining to JPMorgan's clients, employees and business, within 24 hours of notice to Defendant or his counsel of the terms of such an order.

C.    Such other and further relief as the Court deems just and proper.

Dated:  March 24, 2026

Respectfully submitted,

TUOHY BAILEY & MOORE LLP

/s/ Christopher C. Hagenow
CHRISTOPHER C. HAGENOW
Attorney No. 16730-49

TUOHY BAILEY & MOORE LLP
9294 N. Meridian Street
Indianapolis, Indiana  46260
Telephone: (317) 638-2400
Counsel for Plaintiff
J.P. Morgan Securities LLC